**ROLLING LANDS INVESTMENTS, L.C., Appellant,**

v.

**NORTHWEST AIRPORT MANAGEMENT, L.P., d/b/a David Wayne Hooks Memorial Airport, Appellee.**

No. 06–02–00043–CV.

Court of Appeals of Texas, Texarkana.

Submitted Feb. 19, 2003.

Decided June 3, 2003.

Opinion on Rehearing July 3, 2003.

Rod D. Hardie, Jeri P. Wechsler, Hughes, Watters & Askanase, LLP, Houston, for appellant.

Michael L. Landrum, Robert G. Miller, O'Donnell, Ferebee & McGonigal, PC, Houston, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

Northwest Airport Management, L.P., d/b/a David Wayne Hooks Memorial Airport (Northwest), owns and operates a private airport located in Harris County. In 1983, Northwest's predecessor in interest sold an eight-acre subdivision (Tract) to Northwest Jet (Jet), a predecessor in interest to Rolling Lands Investments, L.C. (Rolling Lands). The Tract is located adjacent to the airport. At the time of the sale, the Tract was burdened by deed restrictions, including the following:

(E) In conjunction with Paragraph (B) herein above, it is expressly understood and agreed that Grantee by this conveyance has no right or privilege, either express or implied, of access to or use of the David Wayne Hooks Memorial Airport and its facilities except as specifically granted and defined in and by a License Agreement as may be entered into by and between Grantee and said Airport. This restriction additionally applies to all tenants, lessees, sub-lessees, invitees, licensees, permitees, assigns, and successors in interest of Grantee, and Grantee hereby agrees to expressly inform all such parties of same.

. . . .

(J) No part of the tract shall ever be used for the storage or sale of automotive gasoline or related petroleum products, aviation gasoline, diesel fuel, jet fuel, lubricating oil, or other petroleum products which in any manner would constitute any form of competition with the normal and usual business operations of the David Wayne Hooks Memorial Airport without the express prior written permission of said Airport.

In 1984, pursuant to the deed restrictions, the parties entered into an agreement (1984 Agreement) giving to Jet certain fueling rights and access rights to the airport and its facilities. The 1984 Agreement was scheduled to terminate on May 31, 1996. If Jet or its successor was not in default on May 31, 1996, however, the 1984 Agreement was subject to successive, auto-

matic one-year renewal terms. Those extensions would continue unless Northwest gave notice of termination at least ninety days before the anniversary date, in which case the contract would terminate on that anniversary date.

In 1985, as security for a loan, Jet transferred its fueling rights and access rights to First Interstate Bank (now Wells Fargo Bank),[1] and the Bank properly perfected its security interests. To clarify the rights of each party, Northwest and Jet entered into an agreement in 1989 (1989 Agreement) that provided the parties would be governed by the terms of the original 1984 Agreement,[2] including the above-mentioned durational terms. Further, Northwest and Jet made the 1989 Agreement binding only if the Bank consented to its terms (1989 Consent). In order to obtain the Bank's consent, Northwest and Jet agreed to the additional provisions of the 1989 Consent. Paragraph ten of the 1989 Consent, quoted later, is at the heart of the present dispute.

In 1992, the Bank foreclosed on the Tract and subsequently purchased it at the foreclosure sale. In 1993, the Bank filed a lawsuit against Northwest, seeking access to the airport. In that 1993 suit, the Bank contended (1) the deed restriction limiting access to the airport, restriction E in the deed, violated the Texas Free Enterprise Antitrust Act (TFEAA), (2) restriction E should be declared invalid, and (3) Northwest should be estopped from enforcing it. The Bank, however, did not demand new agreements pursuant to the 1989 Consent, and its 1993 lawsuit did not address the fueling rights restrictive covenant, restriction J in the deed. Before that suit was tried, the parties entered into a settlement

agreement (1993 Agreement) that included an agreed dismissal of the 1993 lawsuit with prejudice. The 1993 Agreement gave the Bank, in common with others authorized to do so, the right to access and use the facilities and appurtenant areas of the airport. The 1993 Agreement also (1) gave the Bank the right to assign or otherwise transfer the Bank's rights and (2) explicitly stated it constituted a novation and replacement of all previous license agreements. After 1993, the Tract went unused until Rolling Lands purchased it from the Bank in 2001.

Shortly before Rolling Lands purchased the Tract, Northwest gave notice of termination on October 18, 2000. On January 30, 2001, Rolling Lands demanded a new fueling rights agreement pursuant to the 1989 Consent and sought access rights pursuant to the 1993 Agreement. Northwest refused to comply with the demand, and Rolling Lands brought this suit to enforce those agreements. Additionally, Rolling Lands claimed that Northwest's attempt to restrict fueling violated the TFEAA. Northwest filed a motion for summary judgment contending Rolling Lands' claims were barred by res judicata, statute of limitations, contract interpretation, and statute interpretation. In response, Rolling Lands filed its own motion for summary judgment seeking declaratory relief, specific performance, and attorney's fees. The trial court granted Northwest's motion and denied Rollings Lands' motion.

On appeal, Rolling Lands brings the following points of error: (1) the trial court erred in granting summary judgment based on res judicata; (2) the trial court erred in granting summary judgment

---

1. Both banks are referred to hereafter as "Bank," as the distinction between them is meaningless for the purposes of this opinion.

2. Subject to amendments appearing on the face of the document, none of which are applicable in the present case.

based on the statute of limitations; (3) Northwest was not entitled to summary judgment based on contract interpretation; and (4) a genuine issue of material fact existed with respect to Rolling Lands' claim that Northwest violated the TFEAA. Additionally, Rolling Lands seeks (1) a declaratory judgment that the 1989 Agreement and Consent and the 1993 License Agreement are valid and enforceable, (2) attorney's fees under the Texas Uniform Declaratory Judgments Act, and (3) specific performance of the 1989 Agreement and Consent and the 1993 License Agreement.

On appeal, summary judgment is reviewed *de novo.* Tex.R. Civ. P. 166(a), (c); *Republic Nat'l Leasing Corp. v. Schindler,* 717 S.W.2d 606, 607 (Tex.1986). The movant has the burden of showing there is no genuine issue of material fact and it is entitled to a judgment as a matter of law. *Limestone Prods. Distribution, Inc. v. McNamara,* 71 S.W.3d 308, 311 (Tex. 2002). A moving defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of the plaintiff's claim, *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991), or every element of an affirmative defense. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex. 1995). Every reasonable inference must be indulged in favor of the nonmovant. *McNamara,* 71 S.W.3d at 311. If a motion for summary judgment is based on several different grounds and the trial court's order does not specify which ground or grounds supported the granting of the motion, the appellant must show that all potential grounds are insufficient, and this Court must affirm the trial court's judgment if any ground is meritorious. *FM Props. Operating Co. v. City of Austin,* 22

S.W.3d 868, 872–73 (Tex.2000). Further, because both parties filed motions for summary judgment and one was granted and the other denied, this Court must review both motions, determine all questions presented, and render the judgment the trial court should have rendered. *See id.* at 872.

### Res Judicata

Northwest argues that any claim to fueling rights must have been asserted in the 1993 lawsuit because (1) the 1989 Consent was an indivisible contract, (2) the terms of the 1989 Consent entitled the Bank or its nominee only one opportunity to demand new agreements, and (3) the fueling rights pertained to the same subject matter as the 1993 suit and should have been litigated.

Northwest's contention, that a claim for a new fueling rights agreement is barred because the 1989 Consent constituted an indivisible contract, fails for two reasons.[3] First, the Bank did not make a demand for a new agreement in 1993. Rather, as previously discussed, the 1993 suit only concerned deed restriction E and its validity. Therefore, there has only been one demand under the 1989 Consent: the demand made in January 2001. Second, even if the Bank made a demand for a new license agreement in 1993, the present case is distinguishable because it arises out of a separate breach. If a demand was made in 1993, Northwest arguably breached the 1989 Consent by failing to execute a license agreement. In 2001, Northwest arguably committed a separate breach by failing to execute a fueling rights agreement, giving rise to a separate cause of action. Accordingly, whether the 1989 Consent is indivisible has no bearing on

---

**3.** Northwest contends that all claims arising out of an indivisible contract must be brought in the same suit.

whether the present suit is barred by res judicata, because it involves a separate breach.

■ Northwest also argues that paragraph ten [4] of the 1989 Consent limits Rolling Lands and its predecessors to making a single demand for new agreements. The rules of contract interpretation do not support Northwest's contention.

■ The interpretation of an unambiguous contract is a question of law for the court. *Edwards v. Lone Star Gas Co., Div. of Enserch Corp.*, 782 S.W.2d 840, 841 (Tex.1990). The reviewing court is not concerned with the intention that existed in the minds of the parties; rather, the contract is interpreted with respect to the intentions expressed solely from the language used. *Wooten Props., Inc. v. Smith*, 368 S.W.2d 707 (Tex.Civ.App.-El Paso 1963, writ ref'd). Where the meaning of the contract is plain and unambiguous, a party's construction is immaterial. *Ussery Inv. v. Canon & Carpenter, Inc.*, 663 S.W.2d 591, 593 (Tex.App.-Houston [1st Dist.] 1983, writ dism'd w.o.j.). Therefore, when a contract is clear and certain and there is no showing of fraud, the instrument alone will be used to determine the intention of the parties, no matter what their actual intention may have been. *Dedier v. Grossman*, 454 S.W.2d 231 (Tex. Civ.App.-Dallas 1970, writ ref'd n.r.e.).

In the present case, the 1989 Consent expressly provides that Northwest is required to execute a new license agreement and a new fueling rights agreement in favor of the Bank or its nominee once it has met certain requirements. The 1989 Consent does not state that the Bank or its nominee may make one demand for both agreements. Therefore, we conclude from the terms of the Consent that multiple demands are permissible.

■ Moreover, even if the 1989 Consent could be construed to require one demand, the record affirmatively shows only one demand has been made, in January 2001. The 1993 suit was not based on a demand for new agreements, and Northwest has produced no evidence to the contrary. Consequently, Northwest's contention is unsupported by the record, and the trial court erred to the extent summary judgment was granted based on this argument.

■ In its third argument based on res judicata, Northwest contends fueling rights pertained to the same subject matter as the 1993 suit and should have been raised at that time. Res judicata precludes the relitigation of claims that have been finally adjudicated in a prior action, as well as claims that pertain to the same subject matter and could have been, but were not, litigated. *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 652 (Tex.1996); *Freeman v. Cherokee Water Co.*, 11 S.W.3d 480, 483 (Tex.App.-Texarkana 2000, pet. denied). In *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 631 (Tex.1992), the Texas Supreme Court held in pertinent part:

> The scope of res judicata is not limited to matters actually litigated; the judgment in the first suit precludes a second action by the parties and their privies not only on matters actually litigated, but also on causes of action or defenses which arise out of the **same subject matter** and which might have been litigated in the first suit.

*Id.* at 630 (citing *Tex. Water Rights Comm'n v. Crow Iron Works*, 582 S.W.2d 768, 771–72 (Tex.1979)) (emphasis added). Further, the court held that a determination of what constitutes the same subject matter requires a factual analysis of the

---

4. A pertinent part of paragraph ten is quoted later in this opinion.

previous lawsuit, and any cause of action which arises out of the same set of facts should have been litigated. *Barr,* 837 S.W.2d at 630.

Like the court in *Barr,* this Court must analyze the facts of the 1993 lawsuit and determine if the present cause of action arises out of the same subject matter. In 1993, Northwest owned a piece of property adjacent to the Tract. The United States Customs Service (USCS) was the lessee of a building on that property, under a lease due to expire in 1993. The Bank wished to sell the Tract to a third party, who intended to enter a bid for the USCS lease. Shortly before the sale, Northwest revoked all access to the airport by the Bank, rendering the Tract unattractive to both the third party and USCS. The Bank brought suit seeking a declaratory judgment that the deed restrictions were invalid and unenforceable, or in the alternative, to construe the restrictions in a manner allowing mutual and reciprocal obligations and burdens of property. The Bank also asserted that Northwest's denial of access constituted a violation of the TFEAA. Therefore, contrary to Northwest's assertion, the Bank did not make a demand for a new license agreement pursuant to the 1989 Consent.

In the present case, Rolling Lands is seeking to enforce the 1989 Consent, requiring Northwest to execute a new fueling rights agreement. The 1993 petition did not mention the 1989 Consent or the Bank's right to demand a new fueling rights agreement, and there is nothing in the record suggesting that fueling rights were at issue. Accordingly, the trial court erred to the extent summary judgment was granted based on res judicata. *See id.*

### Statute of Limitations

 In its next point of error, Rolling Lands contends the trial court erred by granting summary judgment based on Northwest's statute of limitations defense. It is undisputed that the applicable limitations period is four years. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.004 (Vernon 2002). The parties disagree, however, concerning the time the cause of action accrued. Again, this Court reviews a summary judgment *de novo.* TEX.R. CIV. P. 166(a), (c); *Schindler,* 717 S.W.2d at 607.

Northwest argues that the statute of limitations began to run in 1992 when the Bank foreclosed on the Tract and first became eligible under the 1989 Consent to make a demand for new agreements. In support of its contention, Northwest relies on *Stevens v. State Farm Fire and Casualty Co.,* 929 S.W.2d 665 (Tex.App.-Texarkana 1996, writ denied). In *Stevens,* Stevens purchased an insurance policy from State Farm, insuring his home for $167,000.00 and his personal property for $100,260.00. *Id.* at 668. On January 3, 1991, the home burned, and from February to October 1991, State Farm paid a total of $133,522.47 for home repairs. *Id.* Over a year later, Stevens made a demand for an additional $33,577.53. State Farm refused this request, and Stevens sued. *Id.* State Farm argued that Stevens' claim was barred by the statute of limitations because it came over a year after his home had been fully repaired. *Id.* at 671. However, Stevens argued that the limitations period was tolled until he made his demand. *Id.* This Court held that, when a demand is a condition precedent to bringing suit, the injured party may not, by failing to make a demand, postpone the running of the statute. *Id.; see Aetna Cas. & Sur. Co. v. State ex rel. City of Dallas,* 86 S.W.2d 826, 831 (Tex.Civ.App.-Fort Worth 1935, writ dism'd). Further, when a demand is a prerequisite, the injured party must make such a demand within a reasonable time after his or her right arises. *Stevens,* 929 S.W.2d at 671.

The reasonableness of the delay is normally a fact question for the jury, but in the absence of mitigating circumstances, the law will ordinarily consider that a reasonable time will coincide with the running of the statute of limitations, and an action will be barred if a demand is not made within that time period. *Id.* Ultimately, the court did not reach the reasonableness question because Stevens made his demand within the applicable limitations period. *Id.* at 672.

■ Notwithstanding the dicta in *Stevens*, it has been firmly established that, when demand is an integral part of a cause of action, or demand is a condition precedent to the right to sue, the statute of limitations does not begin to run until demand has been made unless the right to make a demand was waived or unreasonably delayed. *Ocean Transp. v. Greycas, Inc.*, 878 S.W.2d 256, 267 (Tex.App.-Corpus Christi 1994, writ denied); *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.); *Gabriel v. Alhabbal*, 618 S.W.2d 894, 896–97 (Tex.Civ.App.-Houston [1st Dist.] 1981, writ ref'd n.r.e.).

The present case is clearly distinguishable from *Stevens*. In the present case, the parties expressly agreed that, after foreclosure and on proper demand, new agreements would be executed in favor of the Bank or its nominee for fueling and license rights. In *Stevens*, Stevens' home had been fully repaired for more than a year before he made his demand. *Stevens*, 929 S.W.2d at 671. At that point, he had already been injured by paying more for the repair of his home, and he had reason to make his demand. *Id.* The 1989 Consent did not require the Bank or its nominee to make the demand within four years, or any period of time, after foreclosure. Unlike *Stevens*, the Bank or its nominee had no reason to make such a demand until it became necessary to exercise fueling rights. As a result, even though a demand was a prerequisite to filing suit, the cause of action did not accrue until the demand was denied and the contract was breached in January 2001. *See Gabriel*, 618 S.W.2d at 896–97. Therefore, the trial court erred to the extent summary judgment was based on Northwest's statute of limitations defense.

### *Contract Interpretation*

#### 1. 1993 License Agreement

■ In its next point of error, Rolling Lands asserts the trial court erred in granting summary judgment with respect to its claim to enforce the 1993 Agreement. Northwest contended the 1993 Agreement was silent as to duration, making it terminable at will. *See Clear Lake City Water Auth. v. Clear Lake Util. Co.*, 549 S.W.2d 385, 390–91 (Tex.1977). On the other hand, Rolling Lands argued the agreement was expressly limited in duration, that it was still in effect at the time Rolling Lands purchased the Tract, and the Bank assigned all licensing rights under the agreement to Rolling Lands.

■ When parties disagree over the meaning of an unambiguous contract, the court must determine the parties' intent by examining and considering the entire writing in an effort to give effect to and harmonize all provisions so that none will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *First City Nat'l Bank v. Concord Oil Co.*, 808 S.W.2d 133, 136 (Tex.App.-El Paso 1991, no writ); *KMI Cont'l Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 241 (Tex.App.-Houston [1st Dist.] 1987, writ denied). The intent of the parties must be taken from the agreement itself, not from the parties' present interpretations, and the agreement must be enforced

as it is written. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731–32 (Tex.1981).

In support of its contention, Northwest relies on *Clear Lake City Water Authority,* 549 S.W.2d at 390–91. In that case, Clear Lake Utilities entered into negotiations for water and sewer service with Clear Lake City Authority, a conservation and reclamation district created pursuant to statute. *Id.* at 387. The parties entered into an agreement on July 11, 1966, in which Authority promised to furnish Utilities with water and sewage treatment service for a 100–acre tract. *Id.* In return, Utilities agreed to construct and maintain a water and sewer pipeline system capable of serving the tract. *Id.* at 387. This contract provided that Utilities "shall have the exclusive right, as between the parties hereto, to furnish water and sanitary sewer service to parties within said tract." *Id.* at 388. The contract was silent as to its duration. *Id.* The court recognized that contracts contemplating continuing performance [5] are indefinite in nature and can be terminated by any party at will. *Id.* The court ultimately held the contract terminable at will for statutory reasons involving the Texas Government Code, none of which are applicable in the present case.

■ When a contract limits duration by the happening of any one of several ascertainable contingencies it is not terminable at will. *City of Big Spring v. Bd. of Control,* 404 S.W.2d 810, 812 (Tex.1966) (contract to continue while State operates hospital not terminable at will); *Brittian v. Gen. Tel. Co.,* 533 S.W.2d 886, 891 (Tex. Civ.App.-Fort Worth 1976, writ dism'd w.o.j.).

Unlike *Clear Lake,* the 1993 Agreement expressly provides for termination of the access rights under certain circumstances. Specifically, the 1993 Agreement provides in pertinent part:

*Term.* This Agreement shall become effective on the date hereinabove specified and shall terminate upon the first to occur of the following events, to-wit:

(a) Landowner defaults in the payment of the access and maintenance fee specified in Paragraph 4 hereof and Airport Owner elects to terminate this Agreement as therein provided; or

(b) Landowner violates one or more of the Restrictions referred to in Paragraph 7 hereof and Airport Owner elects to terminate this Agreement as therein provided; or

(c) The Airport is closed or its operations otherwise permanently cease, for whatever reason, . . . .

Since the 1993 Agreement is fixed and determinable with respect to duration, the trial court erred to the extent summary judgment was granted based on the 1993 Agreement being terminable at will.

**2. 1989 Agreement and Consent (Fueling Rights)**

■ In its next point of error, Rolling Lands contends the trial court erred by granting summary judgment in favor of Northwest with respect to a new fueling rights agreement. The dispute over fueling rights originates from paragraph ten of the 1989 Consent, which provides, in pertinent part:

[I]n the event of a foreclosure or deed in lieu of foreclosure with respect to the Tract, NW Airport agrees upon receipt of a certificate from an officer of the Lender certifying that (i) the Lender

5. We note that the instant contract does not have as its principal purpose ongoing performance by the parties, but principally provides specific rights relative to the Tract. For that reason alone, *Clear Lake* is distinguishable. *Clear Lake City Water Auth. v. Clear Lake Util. Co.,* 549 S.W.2d 385 (Tex.1977).

has foreclosed its lien(s) on the Tract or acquired the Tract through a deed in lieu of foreclosure, (ii) the Lender, its nominee or the purchaser at said foreclosure sale is the new owner of the tract, and (iii) NW Jet no longer has the right to occupy, manage or operate any facilities or operations in or upon the tract; **to execute and deliver to the Lender, its nominee, or said purchaser of the Tract, new agreements containing, subject to the exceptions hereinafter set forth, the same terms and provisions as the License Agreement (as defined in the Security Agreement) and the Amended Fuel Agreement (without regard to any additional amendments thereto), substituting the Lender, its nominee, or said purchaser as the case may be, in place of NW Jet as the party thereto. Notwithstanding the foregoing, NW Airport, the Lender, its nominee, or said purchaser, by entering into such agreements, acknowledges and agrees that, as between NW Airport and the Lender, its nominee, or said purchaser, the execution and delivery of such agreements by the Lender, its nominee, or said purchaser, shall supercede any rights they may have under the Contracts. NW Airport further agrees that** *such agreements shall be effective as of the date of their execution and delivery, unaffected and unimpaired by any then present or future default under or other basis for voiding or terminating, the Contracts,* **and that no amounts shall be payable thereunder, until, or for the period prior to, such time as such person commences to exercise any of its rights thereunder.**

(Emphasis added.)

Rolling Lands contends the phrase "such agreements shall be effective as of the date of their execution and delivery, unaffected and unimpaired by any then present or future default under or other basis for voiding or terminating the Contracts" eliminated Northwest's termination rights. Rolling Lands contends that, on execution of the new agreements, Northwest would not be empowered to give ninety days' notice of termination, and the fueling rights would thus be perpetual under the new agreements, so long as pumping fees were paid.

On the other hand, Northwest contends paragraph ten of the 1989 Consent provided that, unless the contracts· expired by their terms, the Bank after a foreclosure would be able to execute new agreements in its or its nominee's favor containing the same terms as the 1984 Agreement, and the new agreements would not be affected or impaired by then-existing or future grounds for default based on a grievance with Jet. Further, Northwest contends that any new agreements executed in favor of Rolling Lands would be subject to the same termination policy under the 1984 Agreement. Northwest argues that, because notice of termination was given on October 18, 2000, all fueling rights would terminate on May 31, 2001, even if a new fueling rights agreement was executed.

Paragraph ten states that, after foreclosure and demand, Northwest is required to execute agreements in favor of the Bank or its nominee containing the same terms as the "amended fuel agreements."[6] The 1984 Agreement expressly provides the fueling agreements would have a primary term expiring on May 31, 1996, and, provided Rolling Lands' predecessor was not in default at the time the primary term expired, the agreement would renew and extend automatically for successive one-

---

6. It is undisputed that "amended fuel agreements" refers to the 1984 agreement.

year extensions unless there was a default or Northwest gave notice of termination at least ninety days before any prospective anniversary date. Based on those terms, the underlying fueling rights agreement was still in effect when Rolling Lands made its demand for a new fueling rights agreement, and it was entitled to a new fueling rights agreement containing the same terms as the 1984 Agreement. Additionally, under the 1989 Consent, that new agreement would be "unaffected and unimpaired by any then present or future default under or other basis for voiding or terminating the Contracts." According to the terms of the Consent, the new agreement that should have been executed was not subject to nonrenewal based on Northwest's notice in October 2000. Rather, Northwest was required to execute a new fueling rights agreement and, if it desired to keep that contract from renewing, issue a new, timely notice of nonrenewal after its execution. We conclude Northwest must execute a new fueling rights agreement in favor of Rolling Lands, containing the same terms as the original 1984 Agreement, as amended. If Northwest wishes to keep this new agreement from renewing, it must give a new notice of nonrenewal at least ninety days before May 31, the anniversary date.

### Antitrust and Anticompetition

In its next point of error, Rolling Lands contends deed restriction J, prohibiting fuel sales without permission from Northwest, is unenforceable because it is either a violation of the TFEAA or an unreasonable restraint on competition. That point of error raises three principal issues: (1) whether the 1993 lawsuit bars the TFEAA claim being asserted by Rolling Lands under the doctrine of res judicata, (2) wheth-

er deed restriction J constitutes a monopoly under TFEAA, and (3) whether, if not a monopoly under TFEAA, the restriction is an unreasonable covenant not to compete and thus is unenforceable under TEX. BUS. & COM.CODE ANN. §§ 15.50–15.52 (Vernon 2002).

As previously discussed, we have concluded Rolling Lands is not barred by res judicata from asserting its claim that the fueling rights restriction is unenforceable. *See Barr*, 837 S.W.2d at 631. Nonetheless, Rolling Lands fails in its assertions that deed restriction J is unenforceable because the restriction is neither (1) a monopoly under TFEAA nor (2) an unreasonable covenant not to compete.

First, in order to establish that a monopoly exists, there must be a showing the alleged violator (1) obtained monopoly power in a relevant market and (2) willfully acquired or maintained the power through means other than a superior product, business acumen, or historical accident. TEX. BUS. & COM.CODE ANN. § 15.05(b) (Vernon 2002). Further, the Fifth Circuit has consistently held that monopolization is rarely found when the defendant's share of the relevant market is below seventy percent. *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 528–29 nn. 11 & 12 (5th Cir.1982); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n. 2 (5th Cir.1969).[7]

In the present case, the only evidence before the trial court regarding market share was presented by Northwest. Northwest introduced an affidavit from Jagit S. Gill, president of Gill Aviation (the general partner of Northwest). In his affidavit, Gill stated Northwest controlled "less than one-half of one percent

---

7. Section 15.04 of the Code provides that this Act "shall be construed in harmony with federal judicial interpretations of comparable

federal antitrust statutes...." TEX. BUS. & COM. CODE ANN. § 15.04 (Vernon 2002).

of the total aviation fueling market and approximately three and one-half percent of the general aviation market in the Houston area." Rolling Lands failed to present any evidence controverting Gill's affidavit. *See Deaton v. United Mobile Networks, L.P.*, 926 S.W.2d 756, 766–67 (Tex.App.-Texarkana 1996), *aff'd in part & rev'd in part on other grounds*, 939 S.W.2d 146 (Tex.1997); *Gen. Devices v. Bacon*, 888 S.W.2d 497, 504 (Tex.App.-Dallas 1994, writ denied) (summary judgment denied because movant failed to present evidence regarding relevant market or effect on market). Rolling Lands failed to raise a genuine issue of material fact with respect to the possession of a monopoly in the relevant market. *See Perez*, 819 S.W.2d at 471. Accordingly, the trial court did not err in concluding that deed Restriction J does not violate Tex. Bus. & Com.Code Ann. § 15.05(b).

But is the deed restriction an unenforceable covenant not to compete under Tex. Bus. & Com.Code Ann. §§ 15.50–15.52. The fueling rights restriction is a restraint on the use of a single parcel of real property and thus should not be reviewed as a noncompetition contract. *See Ehler v. B.T. Suppenas Ltd.*, 74 S.W.3d 515, 520–21 (Tex.App.-Amarillo 2002, no pet.). Rather, the deed restriction is a covenant running with the land and should be analyzed as such. *See id.* In Texas, a real property covenant runs with the land when it touches and concerns the land, it relates to a thing in existence or specifically binds the parties and their assigns, it is intended by the parties to run with the land, and the successor to the burden has notice. *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987). There must also be privity of estate between the parties when the covenant was made. *Wayne Harwell Props. v. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d

216, 218 (Tex.App.-San Antonio 1997, writ denied).

The restriction at issue here does touch and concern the land because it limits the use to which the land can be put. The written restriction specifically binds the parties and their assigns, and evidences an intent that the restriction run with the land. It is undisputed that Rolling Lands had actual and constructive notice of the deed restrictions before purchasing the Tract. There was also privity of estate when the covenant was established. Thus, the covenant restricting fueling rights on the Tract meets the requirements for a covenant running with the land and should be enforced. *See Harris*, 736 S.W.2d at 635.

### Rolling Lands' Motion for Summary Judgment

**1. Declaratory Relief and Specific Performance**

In its motion for summary judgment, Rolling Lands sought a declaratory judgment that the 1993 Agreement was valid and enforceable, and that Rolling Lands was entitled to the rights set forth in that agreement. Specifically, Rolling Lands contended that the agreement was assignable, that the Bank assigned those rights to Rolling Lands, and that therefore, it is entitled to enforce the Agreement. The intent of the parties must be taken from the agreement itself, not from the parties' present interpretation. *Madeley*, 626 S.W.2d at 731–32.

With respect to assignment, the 1993 Agreement provides in pertinent part: "The license given is personal to Landowner. Landowner may assign or otherwise transfer this Agreement to a subsequent purchaser so long as usage of the Tract at time of assignment is consistent with the deed restrictions applicable to the tract." Contemporaneously with

selling the Tract to Rolling Lands, the Bank generally assigned to Rolling Lands "all ... intangible rights, titles, interests, privileges and appurtenances of [Bank] related to or used in connection with the [Tract] and its operation." Rolling Lands is thus entitled to all of the Bank's rights under the 1993 Agreement, including access to the airport and its facilities.

In addition to the enforcement of the 1993 Agreement, Rolling Lands requested a declaratory judgment that the 1989 Agreement and 1989 Consent were valid and enforceable. As previously discussed, Rolling Lands is entitled to a new fueling rights agreement containing the same terms as the 1984 Agreement, and that new agreement is subject to the terms of duration set forth in the 1984 Agreement.

## 2. Attorney's Fees

In its motion for summary judgment, Rolling Lands sought an award of $100,000.00 for attorney's fees pursuant to the Texas Uniform Declaratory Judgments Act. That Act provides that a court may award costs and reasonable and necessary attorney's fees, provided they are equitable and just. TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997). It has been well established that a party who is awarded a declaratory judgment at a summary judgment proceeding is entitled to attorney's fees. *Tex. River Barges v. City of San Antonio*, 21 S.W.3d 347, 358 (Tex. App.-San Antonio 2000, pet. denied); *Chandler v. Chandler*, 991 S.W.2d 367, 405–06 (Tex.App.-El Paso 1999, pet. denied). Because Rolling Lands is entitled to declaratory relief in this summary judgment proceeding, Rolling Lands is entitled to reasonable and necessary attorney's fees provided they are equitable and just. *See Tex. River Barges*, 21 S.W.3d at 358; *FM Props. Operating Co.*, 22 S.W.3d at 872.

Whether attorney's fees are reasonable and necessary is a question of fact, while equity and justness are questions of law. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex.1998). In order to determine reasonableness and necessity, courts are guided by the following factors:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 1998) (TEX. STATE BAR R. art. X, § 9); *see Bocquet*, 972 S.W.2d at 21 (referring court to Rule 1.04). In the present case, Rolling Lands submitted the uncontroverted affidavit of Rod Hardie as summary judgment evidence in support of its request for attorney's fees. In his affidavit, Hardie states that he has practiced law since 1982, primarily in commercial and business litigation matters; that he is familiar with the attorney's fees customarily charged to similarly situated clients; and that fees are justified based

on a list of services that "have been or will be rendered." Without more, Hardie concludes, "[i]n my opinion, taking into consideration the usual and customary attorney's fees in Harris County, Texas, the amount in controversy, the legal questions involved, the fee arrangement with the client, the benefits conferred, and the time required, a reasonable and necessary attorney's fee . . . is $100,000."

▮ In a summary judgment proceeding, the movant has the burden of showing there is no genuine issue of material fact, and all doubts regarding a material fact are resolved in favor of the nonmovant. *McNamara*, 71 S.W.3d at 311. Further, the basis of an expert witness' opinion may settle a dispute as a matter of law, not the witness' credentials or their unsubstantiated opinions. *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex.1999). In the present case, Hardie's affidavit fails to set forth sufficient evidence to form a basis for his conclusion. The affidavit by its own terms states that attorney's fees are based partly on services that have not even been performed, but only expect to be performed. The affidavit fails to set forth details about the representation that could guide this Court in making a determination on the reasonableness and necessity of attorney's fees. Therefore, even though the affidavit was uncontroverted, Rolling Lands has failed to present sufficient summary judgment evidence on which to decide this issue as a matter of law, and the case will be remanded to determine the reasonableness and necessity of the attorney's fees.

### Conclusion

For the reasons stated, we (1) reverse Northwest's summary judgment; (2) reverse the denial of Rolling Lands' motion for summary judgment and render judgment in favor of Rolling Lands that the 1989 Agreement and Consent and the 1993 Agreement are valid and enforceable and that Rolling Lands is entitled to the performance of those agreements, including Northwest's execution of a new fueling rights agreement containing the same terms as the 1984 Agreement; provided that the new fueling rights agreement shall have an initial term, and successive one-year renewal terms, carrying the expiration/anniversary/renewal date of May 31, subject to future nonrenewal by written notice of nonrenewal given to Rolling Lands at least ninety days before any future anniversary (renewal) date; and (3) remand this cause to the trial court for a factual determination with respect to the reasonableness of, and necessity for, Rolling Lands' attorney's fees. *See* TEX.R.APP. P. 43.2.

### ON MOTION FOR REHEARING

Appellee, Northwest Airport Management, L.P., d/b/a David Wayne Hooks Memorial Airport, and ·Appellant, Rolling Lands Investments, L.C., each file a motion for rehearing herein. We have reviewed those motions, along with our original opinion and the law, and conclude we were correct in our original opinion and disposition of this case as to all substantive matters we addressed. Accordingly, we overrule points one through three of Northwest's motion for rehearing. We issue this opinion on rehearing to address the clarifications requested by the parties in their respective motions for rehearing, Rolling Lands' sole point and Northwest's points four and five.

▮ Rolling Lands points out that its motion for summary judgment in the trial court did not exhaust all causes of action below, but left for later determination its claim for damages for breach of contract. When, as happened in this case, both parties file motions for summary judgment and one is granted and the other

denied by the trial court, this Court reviews both motions, determines all questions presented, and renders the judgment the trial court should have rendered. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex.2000).[8] That is what we did. Our disposition necessarily left open for future disposition by the trial court any causes of action or issues not covered by the competing motions for summary judgment, including Rolling Lands' breach of contract cause of action in its entirety.

Northwest, in point four of its motion for rehearing, asks that we clarify our judgment to make clear deed restriction J (fueling rights) is enforceable. That was stated in our opinion, and we now clarify our judgment accordingly.

Northwest, in the fifth and final point of its Motion for Rehearing, asks that we clarify our opinion and judgment to make clear that the 1993 License Agreement is valid and binding on the parties. The 1993 lawsuit, cause number 93–28412 in the 334th Judicial District Court of Harris County, Texas, was settled in 1993 by a "Release and Settlement Agreement," which called for, and pursuant to which was executed, a separate 1993 agreement styled "David Wayne Hooks Memorial Airport Access and Maintenance Agreement a/k/a License Agreement" (1993 License Agreement). Implicit in our opinion was our conclusion that the 1993 License Agreement continued to be valid and binding on the parties to this litigation, without any further license agreement. We now clarify our judgment accordingly.

---

8. When the party against which summary judgment is improperly rendered by the trial court has there sought only a partial summary judgment, ordinarily it is improper for the appellate court which reverses that summary judgment to also render judgment for the appellant. *CU Lloyd's of Tex. v. Feldman*, 977 S.W.2d 568, 569 (Tex.1998). But, when that party's requested partial summary judgment is for a declaratory judgment, a rendition is proper where it should have been the result in the trial court. *Bowman v. Lumberton Indep. Sch. Dist.*, 801 S.W.2d 883, 889 (Tex.1990); *see Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988). The rendition of judgment for Rolling Lands is a declaratory judgment.